1
2
3
4
5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9  HTS, Inc., an Arizona Corporation,        )  No. CV-12-835-PHX-BSB
                                             )
10             Plaintiff,                     )  **REPORT AND RECOMMENDATION**
                                             )
11  vs.                                       )
                                             )
12  David Boley, et. al.,                     )
                                             )
13             Defendants.                    )
                                             )
14  _____ )

15          This matter is before the Court on the Plaintiff's motion for default judgment. (Doc. 17.)

16  In its Complaint, Plaintiff, HTS, Inc. (HTS), alleges claims against Defendants David Boley

17  (Boley) and NuVision Systems (NuVision) for false designation of origin and trademark

18  infringement under 15 U.S.C. § 1125(a), misappropriation of trade secrets under the Arizona

19  Uniform Trade Secrets Act (AUTSA), Ariz. Rev. Stat. § 44-401 to § 44-404, and common law

20  tort claims for breach of fiduciary duty and unfair competition.[1] (Doc. 8.)  HTS served Boley

21  by publication on July 22, 2012.  (Doc. 14.)  Based on Boley's failure to answer or otherwise

22  respond to the Complaint, the Clerk of Court entered default against Defendant Boley.

23  (Doc. 16.)

24

25  ─────────────────

26          [1] HTS filed a complaint on April 23, 2012 (Doc. 1) and filed a "corrected" complaint on
    April 25, 2012. (Doc. 8.)  On May 4, 2012, HTS consented to magistrate judge jurisdiction
27  pursuant to 28 U.S.C. 636(c).  However,  because Defendants have not appeared or consented
    to Magistrate Judge jurisdiction, the Court proceeds by a Report and Recommendation.  *See*
28  General Order 11-03.

1   The Court held a hearing on HTS's motion for default judgment and, for the reasons set

2   forth below, recommends that default judgment be entered in favor of HTS and against Boley.

3   (Doc. 13.)   Because the record reflects that HTS has not served NuVision, and the Court

4   previously warned HTS that failure to serve NuVision could result in dismissal of that

5   Defendant (Doc. 13), the Court recommends that HTS's claims against NuVision be dismissed

6   without prejudice pursuant to Fed. R. Civ. P. 4(m).

7   **I.     Procedural Background**

8   **A.     Jurisdiction**

9   HTS is an Arizona corporation.  (Doc. 8 ¶ 1.)  Since 1981, HTS has been developing and

10   selling vision enhancement products, which it markets and sells with its "eye-design" logo (the

11   Mark).   (Doc. 8 ¶ 6, Ex. A.)   HTS solicits and receives customer orders for its products

12   throughout the United States through various means, including through the internet at its

13   website www.homevisiontherapy.com.  (*Id.* at ¶ 2, Ex. B.)  Boley was an HTS employee from

14   May 2005 until July 2011.  (*Id.* at ¶ 5.)

15   The Complaint alleges that Boley is a resident of Maricopa County, Arizona and that

16   NuVision is an "entity of unknown origin sponsored and/or promoted by Defendant Boley with

17   its headquarters in Maricopa County, Arizona."  (*Id.* at ¶¶ 7-8.)  The Complaint also alleges that

18   Defendants market and sell vision enhancement software and hardware in direct competition

19   with HTS (*Id.* ¶ 9), and that Defendants do business in Arizona through various means,

20   including using the website www.nuvisionsystems.net to offer vision-related software

21   applications.  (*Id.* ¶ 10.)

22   This action seeks injunctive relief and monetary damages based on Boley's alleged

23   intentional infringement of HTS's distinctive "eye-design" logo, or Mark, misappropriation of

24   trade secrets, breach of his fiduciary duties, and unfair competition.   Count One alleges false

25   designation of origin and trademark infringement in violation of 15 U.S.C. § 1125(a).   (*Id.* at

26   ¶¶ 44-59.)   Counts two, three, and four allege state law claims for misappropriation of trade

27   secrets, breach of fiduciary duty, and unfair competition.  (*Id.* at ¶¶ 60-77.)  The Court has

28

original subject matter jurisdiction over HTS's federal claim pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over HTS's state law claims.  *See* 28 U.S.C. § 1367(a) ("in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims" that are part of the same "case or controversy").

**B.      Sufficiency of Service of Process**

Because a federal court lacks jurisdiction over a defendant unless he has been properly served, before determining whether to enter default judgment, the Court must "'first assess the adequacy of service of process on the party against whom default is requested.'" *See Golden Scorpio Corp. v. Steel Horse Saloon I*, 2009 WL 976598, *1 (D. Ariz. Apr. 9, 2009) (quoting *Bank of the West v. RMA Lumber, Inc.*, 2008 WL 1474650, at *2 (N.D. Cal. June 17, 2008)). *See also, Mason v. Genisco Tech. Corp.*, 960 F.2d 849, 851 (9th Cir.1992) ("A person is not bound by a judgment in a litigation to which he or she has not been made a party by service of process."). The record establishes that HTS properly served Boley by publication.

Under Federal Rule of Civil Procedure 4(e)(1) "an individual may . . . be served in a judicial district of the United States by . . . following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1).  Under Arizona Rule of Civil Procedure 4.1(l), service by publication is permitted "[w]here the person to be served is one whose residence is unknown to the party seeking service but whose last known address was within the state, or has avoided service of process, and service by publication is the best means practicable under the circumstances for providing notice of the institution of the action."  *Id*.

Rule 4.1 further provides that "[w]hen the residence of the person to be served is known, the party or officer making service shall also, on or before the date of the first publication, mail the summons and a copy of the pleading being served, postage prepaid, to that person at that person's place of residence." *Id.*  When service by publication is completed, the party or officer making service must file "an affidavit showing the manner and dates of the publication and mailing, and the circumstances warranting the utilization of [service by publication]," with "[a]

- 3 -

printed copy of the publication" attached.  Ariz. R. Civ. P. 4.1(l). This affidavit is prima facie evidence of compliance with the rule's requirements.  *Id.*

Here, upon receipt of the summons from the Court, HTS, through a process server, attempted to personally serve Boley at his last known address, 2793 S. Key Biscayne Drive, Gilbert, Arizona and at several other addresses.  (Doc. 14, Ex. C; Doc. 15, attachment 1.)  The process server reported that he could not locate Boley at any of the addresses, and that he had learned that Boley was "jumping from place to place."  (*Id*.)  The process server conducted several internet searches and a "skip trace" to locate Boley, but his efforts were fruitless.  (*Id.*)  In addition, HTS attempted to mail copies of the Complaint to Boley at several addresses through the United States Postal Service and to several e-mail addresses.  Those attempts were also unsuccessful.  (Doc. 14, Ex. B.)  HTS hired a private investigator to attempt to locate Boley.  That attempt also failed.  (Doc. 14 at 3.)

On July 23, 2012, HTS filed a Notice of Service by Publication and Affidavit stating that it had served Boley by publishing the summons in the Arizona Capitol Times on June 22, 2012, June 29, 2012, July 6, 2012, and July 13, 2012.  (Doc. 12.)  Plaintiff attached an affidavit of Laura Kaminski, the Public Manager of the Arizona Capitol Times, averring that the summons was published on those dates.  (Doc. 12, attachment 1.)  The affidavit includes a copy of the text of the summons. (*Id.*; Hearing Ex. 2.)

The record reflects that HTS was unable to locate Boley despite its exercise of due diligence and that HTS complied with the publication procedures of Rule 4.1(l).  Accordingly, service of Boley by publication complied with the federal and Arizona rules of civil procedure and provided sufficient notice of this action.  *See Master Fin., Inc. v. Woodburn*, 90 P.3d 1236, 1239-40 (Ariz. Ct. App. 2004) ("[S]ervice by publication is . . . sufficient when a plaintiff has exercised due diligence to personally serve a resident defendant at a last known address within the state and has complied with the publication procedures of Rule 4.1.").

## II.        Plaintiff's Allegations and Request for Injunctive Relief and Damages

As set forth above, HTS is an Arizona corporation that has been developing and selling vision enhancement and therapy products in the United States and around the world since 1981. (Doc. 8 ¶ 6, Ex. A.)  HTS alleges it has thousands of clients to whom it provides services and that it maintains information about its clients — including client identity, contact information, pricing information, and client preferences — as confidential information in a database accessible only by select employees through a password-protected server.  HTS keeps information about profit margins and business strategy confidential.  (Doc. 8 ¶¶ 3-4.)  HTS alleges that it has devoted considerable resources over the past seventeen years to developing its products, developing client relationships, and building its reputation in the marketplace, including through prominent and consistent use of its "eye-design" logo or its Mark.  HTS alleges that it has achieved a reputation for excellence in design, manufacture, and the sale of its vision enhancement products.  (Doc. 8 ¶¶ 16-18.)

HTS hired Boley in May 2005 to provide technical support services to various clients. (Doc. 8 ¶ 20.)  Boley worked for HTS until July 6, 2011, when he resigned.  (Doc. 29, Tr. at 81.)[2]  Approximately a year before his resignation, in August 2010, Boley expressed an interest in purchasing HTS and requested access to confidential HTS information to evaluate the potential purchase. (Doc. 8 ¶ 26.)  HTS gave confidential financial information to Boley under the express condition that Boley could only use the information to determine whether he wanted to purchase HTS.  (*Id.* ¶ 27-28.)

In addition to that information, as part of his job duties, Boley had access to the password-protected HTS server and thus had access to confidential customer information.  (*Id.* ¶¶ 21-22.)  Before his departure from HTS, Boley formed a company called NuVision Systems and selected a logo.  (*Id.* ¶¶ 23-24.)  HTS alleges that while he was working for HTS, Boley solicited HTS's clients to provide financing for NuVision, to do business with NuVision, or to

---

[2]  Citations to "Doc. 29, Tr. at __" and to "Hearing Ex." are to the transcript of the default judgment hearing and the exhibits admitted at that hearing.

join NuVision's management. (Doc. 8 ¶ 6.) HTS also alleges that Boley provided prospective investors and clients with a business proposal (the Proposal). (Doc. 8 ¶¶ 30, 31, Ex. C.)

The Proposal included HTS's confidential information, including profit margin information, and prominently displayed an "eye-design" logo (the infringing Mark)  that resembles HTS's Mark. (*Id.* ¶¶ 30-32.) HTS further alleges that the Proposal implies that NuVision will be able to take one half of HTS's clients. (*Id.* ¶ 38.) Boley also used his infringing Mark on NuVision's website.  HTS alleges that Boley's infringing Mark is confusingly similar to HTS's Mark and that his use of this infringing Mark was likely to cause confusion, mistake, or deception as to the source of the origin of Defendants' goods and services, or was likely to falsely suggest a sponsorship, connection, license, or association between Defendants and their products and HTS. (Doc. 8 ¶¶ 37-40, Ex. D.) Boley continued engaging in this conduct after his departure from HTS.  HTS alleges that Boley knew that his actions violated HTS's rights in the Mark, violated Boley's fiduciary duty as a present and past employee of HTS, and amounted to misappropriation of trade secrets and unfair competition. (Doc. 8 ¶ 34.)

Pursuant to Rule 55(b)(2), HTS seeks a default judgment against Boley for violation of HTS's trademark, in violation of 15 U.S.C. § 1125(a), misappropriation of HTS's trade secrets, breach of fiduciary duties owed to HTS, and engaging in unfair competition. (Doc. 17-6.) HTS also requests a permanent injunction under the Lanham Act, 15 U.S.C. § 1116(a), that enjoins Boley, his agents, representatives, employees, assigns, and suppliers from using the infringing Mark and from using or disclosing any of HTS's confidential information. (Doc. 17-7.)

HTS also seeks damages in the following amounts: (1) $10,216.00 for the value of products Boley gave to HTS's clients as part of his attempt to curry favor with those clients and to encourage them to join in Boley's competing business; (2) $2,145.00 in "miscellaneous damages"; (3) $98,914.00 restitution for compensation HTS paid to Boley; (4) $382,470.00 for lost business opportunities withheld from HTS and pursued by Boley; and, (5)  $27,157.95 in attorneys' fees and $536.60 in costs.  Finally, HTS seeks $789,662.00 in exemplary damages

under Ariz. Rev. Stat. §44-403(B) for Boley's misappropriation of HTS's trade secrets in violation of the AUTSA.  (Doc. 17, attachment 1).

### III.    Standards for the Entry of Default Judgment

Federal Rule of Civil Procedure 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules . . . the clerk shall enter the party's default."  After a default has been entered and the defendant fails to appear or move to set aside the default, the court may, on the plaintiff's motion, enter a default judgment.  Fed. R. Civ. P. 55(b)(2).

Granting default judgment is within the court's discretion.  *See Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980) (considering lack of merit in plaintiff's substantive claims, the court did not abuse its discretion in declining to enter a default judgment).  When deciding whether to grant default judgment, the court considers the following factors: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and, (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

Having considered HTS's motion for entry of default judgment, HTS's supplemental brief, and the testimony and evidence presented at the default judgment hearing, the Court finds that default judgment is appropriate under the *Eitel* factors, as set forth below.

### A.    The First, Fourth, Fifth, Sixth, and Seventh *Eitel* Factors

The first, sixth, and seventh *Eitel* factors weigh in favor of default judgment in this case. The first *Eitel* factor considers whether HTS will suffer prejudice if default judgment is not entered.  *Pepsico, Inc. v. Cal. Sec. Cans*., 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).  Boley has failed to appear or otherwise defend this action.  In the absence of a default judgment, HTS "would be without other recourse for recovery," to which it is entitled.  *See Philip Morris*, 219 F.R.D. at 499.

The sixth *Eitel* factor considers whether the default was due to excusable neglect. There is no evidence that Boley's failure to appear or otherwise defend was the result of excusable neglect. Rather, the record reflects that Boley failed to appear after being served by publication with the Complaint. Thus, the sixth *Eitel* factor weighs in favor of default judgment.

Under the seventh *Eitel* factor, the Court must also consider the policy considerations that, whenever possible, cases should be tried on the merits. *Id*. at 1472. The existence of Rule 55(b), however, indicates that the preference for resolving cases on the merits is not absolute. *PepsiCo, Inc*., 238 F. Supp. 2d. at 1177. Because Boley has not appeared or responded in this action, deciding this case on the merits is "impractical," if not impossible. *Id.* Thus, the seventh *Eitel* factor weighs in favor of default judgment.

The fourth and fifth *Eitel* factors are neutral in this case. The fourth *Eitel* factor balances the amount of money at stake in relation to the seriousness of the defendant's conduct. *Eitel*, 782 F.2d at 1471-72. Here, HTS seeks injunctive relief to prevent economic harm, to protect its business reputation, protect its Mark, prevent customer confusion, and prevent other harm that was caused by Boley's conduct. HTS also seeks monetary damages in the amount of $493,745.00 (Doc. 17, attachment 6), and exemplary damages of $789,662.00 (Doc. 30.) Although these are sizeable amounts, considering the seriousness of the allegations and the need to deter such behavior in the future, the amount at stake is not necessarily excessive. Thus, the fourth factor is neutral.

The fifth *Eitel* factor considers the possibility that material facts may be in dispute. *Eitel*, 782 F.2d at 1471-72. Because Boley has failed to respond in this action, and thus has not asserted that there are material facts in dispute, the Court may not adequately weigh this factor. Thus, this factor is neutral.

**B.    The Second and Third *Eitel* Factors**

The second and third *Eitel* factors consider the merits of the plaintiff's claims and the sufficiency of the complaint. As set forth below, after considering Plaintiff's claims for

trademark infringement, misappropriation of trade secrets, and breach of fiduciary duty and unfair competition, the Court finds that these factors also support default judgment in this case.

### 1.  False Designation of Origin/Trademark Infringement

HTS seeks relief under Section 43 of the Lanham Act, 18 U.S.C. § 1125(a), asserting its rights as the owner of an unregistered trademark.[3]  Section 43(d) of the Lanham Act, prohibits using in commerce in connection with goods or services "[a]ny word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another."  15 U.S.C. § 1125(a)(1).

Under § 1125(a), the ultimate test is whether public is likely to be deceived or confused by the similarity of the marks.  *See Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 632 (9th Cir. 2008) (key determination is "whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes that product").  To prevail on its trademark and false designation claims, HTS must show that it owns protectable trademark rights and that Boley's activities are likely to confuse consumers as to the source of the goods.  *See Brookfield Commc'ns., Inc. v. West Coast Entm't Corp*., 174 F.3d 1036, 1046 (9th Cir. 1999). "[T]he standard test of ownership is priority of use . . . . [T]he party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).

---

[3]  While Section 32 of the Lanham Act applies only to officially registered trademarks, Section 43 protects against infringement of unregistered marks and trade dress as well as registered marks.  *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 n.3 (9th Cir. 2000).  Federal registration of a trademark is not required for standing to sue under Section 43 of the Lanham Act.  *Halicki Films, LLC v. Sanderson Sales & Mktg*., 547 F.3d 1213, 1226 (9th Cir. 2008); *see also Lahoti v. VeriCheck, Inc*., 586 F.3d 1190, 1196 (9th Cir. 2009) ("[f]ederal trademark registration is not a prerequisite for protection under the Lanham Act . . . .").

Here, based on Boley's default, there is no dispute that HTS acquired ownership of the "eye-design" Mark through its prior use in commerce for the past seventeen years. *See Chance v. Pac.-Tel Teletrac Inc.,* 242 F.3d 1151, 1159 (9th Cir. 2001) (providing a non-exclusive list of five factors for the court to consider when determining whether a plaintiff has established ownership in a mark through use in commerce); (Doc. 8 ¶¶ 1-2, Exs. A and B.)  The factual allegations in the Complaint establish that HTS has valid and protectable rights in its Mark. Additionally, during the default judgment hearing, HTS provided evidence of its use of the Mark in interstate commerce and on the internet.  (Hearing Exs. 4 and 5.)  Rod Bortel (Bortel), HTS's owner, testified that HTS uses its Mark on its website, brochure, letterhead, and on all goods and services the company provides.  (Doc. 29, Tr. at 12.)

HTS must also show that Boley's use of an "eye-design" logo is likely to confuse consumers as to the source of the goods. "The likelihood of confusion is the central element of trademark infringement, and the issue can be recast as the determination of whether 'the similarity of the marks is likely to confuse customers about the source of the products.'" *GoTo.com*, 202 F.3d at 1205 (quoting *Official Airline Guides v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993)).  The Ninth Circuit has developed eight factors, the *Sleekcraft* factors, to analyze the likelihood of confusion: (1) the similarity of the marks; (2) the relatedness of the two companies' services; (3) the marketing channels used; (4) the strength of the plaintiff's mark; (5) the defendant's intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers.  *Id.* (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49. (9th Cir. 1979)).

The eight-factor test is "pliant."  When the relevant marketing channel is the internet, the three most important *Sleekcraft* factors are: (1) the similarity of the marks; (2) the relatedness of the goods or services; and, (3) the "simultaneous use of the Web as a marketing channel." *Brookfield*, 174 F.3d at 1055 n.16 (citing *Comp Exam'r Agency, Inc. v. Juris*, *Inc*., 1996 WL 376600, *1 (C.D. Cal. Apr. 26, 1996.)). Because Boley admitted by default that he markets products through the internet (Doc. 8 ¶¶ 5, 10), and the evidence presented at the default

judgment hearing established that HTS markets its products through the internet (Doc. 8 ¶ 2; Doc. 29, Tr. at 12), the Court focuses on the three most important *Sleekcraft* factors.

Under the *Sleekcraft* factors, the Court's analysis of the likelihood of confusion begins by comparing Defendant's allegedly infringing Mark to HTS's Mark.  The greater the similarity between the two marks, the greater the likelihood of confusion.  Three axioms guide the Court's comparison: "first, the marks must be considered in their entirety and as they appear in the marketplace, . . . ; second the similarity is adjudged in terms of appearance, sound, and meaning, . . . ; and third, similarities are weighed more heavily then differences."  *GoTo.com*, 202 F.3d at 1206 (internal citations omitted).  Here, Boley admitted by default that the two marks are "confusingly similar."  (Doc. 8 ¶ 37.)  The record reflects that both marks consist of an elliptical shape resembling an eye.  Both appear along with the company's name, HTS or NuVision, directly above or above and slightly to the right of the eye image.  (Doc. 8, Exs. A and B.)  Under this first *Sleekcraft* factor, the Court finds that the similarity of the infringing Mark to HTS's Mark is likely to cause confusion.

The second *Sleekcraft* factor considers the relatedness of the goods.  "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods."  *Brookfield*, 174 F.3d at 1055.  Here, Boley admitted by default that he markets and sells vision enhancement products and services in direct competition with HTS.  (Doc. 8 ¶ 9, Exs. A and B.); *See GoTo.com*, 202 F.3d at 1207 (companies operating search engines were in direct competition and offered similar services).  In addition, at the default judgment hearing, Bortel testified that the products Boley described in the Proposal were the same as HTS's vision therapy products.  (Doc. 29, Tr. at 68-70.)

The third relevant *Sleekcraft* factor is the marketing channel.  Both HTS and Boley use the internet to market and sell their products and services.  (Doc. 8 ¶¶ 9-10, 39.)  The Ninth Circuit has noted that "the Web, as a marketing channel, is particularly susceptible to a likelihood of confusion, since . . . it allows for competing marks to be encountered at the same time, on the same screen."  *GoTo.com*, 202 F.3d at 1207.

The similarity of the marks, the similarity of the goods and services offered by HTS and Boley, and their use of the internet to market those goods and services, support a finding that Boley's use of his "eye-design" logo is likely to cause confusion among consumers as to the source of the goods and services.  Having found a likelihood of confusion, under the three most important *Sleekcraft* factors, the Court need not consider the remaining factors.  HTS has sufficiently pled Boley's false designation of origin in violation of 15 U.S.C. § 1125(a).  Accordingly, the second and third *Eitel* factors favor entry of default judgment as to HTS's claim for trademark infringement in violation of 15 U.S.C. § 1125(a).

### 2.   Misappropriation of Trade Secrets

In its second ground for relief, HTS asserts a claim for misappropriation of trade secrets under the AUTSA, Ariz. Rev. Stat. § 44-403(A).  (Doc. 8 ¶¶ 60-63.)  To state a claim under the AUTSA, a plaintiff must allege that the defendant misappropriated a trade secret through improper means.  Ariz. Rev. Stat. § 44-401.   A trade secret is information that derives independent economic value "from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Ariz. Rev. Stat. § 44-401(4).   "[A] trade secret is not simply information as to single or ephemeral business events. Rather, a trade secret may consist of a compilation of information that is continuously used or has the potential to be used in one's business and that gives one an opportunity to obtain an advantage over competitors who do not know of or use it." *Enter. Leasing Co. of Phoenix v. Ehmke*, 3 P.3d 1064, 1068 (Ariz. Ct. App. 1999) (internal citations omitted).

A plaintiff seeking relief for misappropriation of trade secrets must describe the "subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *IMAX Corp. v. Cinema Tech. Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) (internal citations omitted).  Under Arizona law, "matters of general knowledge cannot be appropriated as secret, [however,]

- 12 -

a trade secret may consist of a combination of elements even though each individual component may be a matter of common knowledge." *Id.* at 1069. "A list of customers, if their trade and patronage have been secured by years of business effort and advertising and the expenditure of time and money, constitutes an important part of a business and is in the nature of a trade secret." *Prudential Ins. Co. v. Pochiro*, 736 P.2d 1180, 1183 (Ariz. Ct. App.1987) (quoting *Town & Country House & Home Serv., Inc. v. Evans*, 189 A.2d 390, 393–94 (Conn. 1963)).

Here, the allegations in the Complaint, taken as true on default, establish that HTS made reasonable efforts to maintain the confidentiality of its customer lists, contact information, and HTS's financial information and metrics. (Doc. 8 ¶¶ 4, 32, 61.) HTS developed this information over many years, and it is a source of competitive advantage over other companies in the marketplace. (Bortel Decl. ¶ 2.)[4] HTS derives economic value from its customer lists, contact information, financial information, and metrics as a result of the confidential nature of this information. (Doc. 8 ¶ 62.) Only a limited number of HTS employees have access to this password-protected information. (*Id.* ¶ 22.) Thus, the Court concludes that HTS's customer lists, contact information, financial information, and metrics qualify as trade secrets.

HTS alleged that Boley knew the confidential nature of HTS's customer lists, customer contact information, financial information, and metrics and that he was under a duty not to disclose or misuse that information. (Doc. 8 ¶ 30; Bortel Decl. ¶ 8.) Additionally, when HTS gave Boley access to additional confidential information for the limited purpose of evaluating whether to purchase HTS, it emphasized the confidential nature of that information and the limited scope for which Boley could use it. (Doc. 8 ¶ 28.) Furthermore, Boley threatened to disclose and did disclose those trade secrets in connection with promoting his new company, NuVision. (Doc. 8 ¶¶ 5, 29-32, 34 and 38.)

---

[4] Citations to "Bortel Decl." are to the "Declaration of Rod Bortel in Support of Plaintiff HTS, Inc.'s Motion for Entry of Default Against Defendant David Boley." (Doc. 17, attachment 4.)

Under Arizona law, misappropriation of a trade secret includes the "[d]isclosure or use of a trade secret of another without express or implied consent by a person" who "[a]t the time of the disclosure or use," "knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. . . ." Ariz. Rev. Stat. § 44-401. The factual allegations in the Complaint, taken as true on Boley's default, establish that he misappropriated or threatened to misappropriate HTS's trade secrets. HTS sufficiently alleged that Boley misappropriated its trade secrets in the form of customer lists, customer contact information, and HTS's financial information and metrics. Accordingly, the second and third *Eitel* factors favor entry of default judgment as to HTS's claim for misappropriation of trade secrets under Ariz. Rev. Stat. § 44-403(A).

### 3.     Breach of Fiduciary Duty and Unfair Competition

Count Three alleges that Boley breached his fiduciary duties of loyalty and confidentiality under Arizona common law. (Doc. 8 ¶¶ 64-71.) Specifically, HTS alleges that Defendant Boley breached his common law fiduciary duties of confidentiality and loyalty by using or disclosing trade secrets before and after leaving his employment with HTS. (Doc. 8 ¶¶ 65, 66, 67 and 68). Count Four alleges that Boley engaged in unfair competition by "misappropriating Plaintiff's confidential information (including Trade Secrets) to divert or damage Plaintiff's business relationships, expectancies, and opportunities to the detriment of Plaintiff." (Doc. 8 ¶ 73.)

#### a.     AUTSA Preemption

The AUTSA, Ariz. Rev. Stat. § 44-407, preempts "conflicting tort, restitutionary and other laws of this state that provide civil remedies for misappropriation of trade secrets.[5]

---

[5]   The Court cannot enter default judgment on preempted claims because such claims "contain no cause of action that [could have] proceed[ed] to trial," and thus, contain no cause of action upon which the Court could enter judgment. *See Firetrace USA , LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1050 (D. Ariz. 2010) (concluding that defendants did not, and could not have, waived the defense that the plaintiffs failed to state claims upon which relief could be granted based on preemption under the AUTSA); *Penpower Tech. Ltd. v. S.P.C. Tech.*, 627

- 14 -

Ariz. Rev. Stat. § 44-407(A).  However, contractual and criminal remedies are excepted from preemption.  *Id*. § 44-407(B).  The AUTSA further "preempts all common law tort claims based on misappropriation of information, whether or not it meets the statutory definition of a trade secret."  *Universal Engraving, Inc. v. Metal Magic, Inc*. 2012 WL 4358942, *2 (D. Ariz. Sept. 21, 2012) (citing *Firetrace*, 800 F. Supp. 2d at 1049–50 (compiling cases with such holdings)).

That interpretation is consistent with the majority interpretation of an identical preemption provision in the Uniform Trade Secrets Act (UTSA), after which the AUTSA is patterned.  *See Firetrace*, 800 F. Supp. 2d. at 1047-48.  The statute's purpose of creating uniform standards for liability and eliminating "other tort causes of action founded on allegations of misappropriation" would be undermined if plaintiffs could circumvent the AUTSA by "dressing up" misappropriation claims as common-law torts.  *Universal Engraving, Inc.*, 2012 WL 4358942, at *2 (citing *Firetrace*, 800 F. Supp. at 1048).

In conformity with the holdings of the various courts as set forth in *Firetrace*, HTS may not bring any non-AUTSA claims based on a theory of misappropriation of confidential information, regardless of whether the information constituted a "trade secret" under the AUTSA.  Nevertheless, the AUTSA does not bar claims based on alleged acts other than the misappropriation of information.  *See Firetrace*, 800 F. Supp. 2d at 1050.

HTS's claim of breach of the fiduciary duty of confidentiality is based on the misappropriation of confidential information, including trade secrets, and is preempted by the AUTSA.  *See Food Servs. of Am. Inc. v. Carrington*, 2013 WL 424507, *4 (D. Ariz. Feb. 4, 2013) (the AUTSA preempted plaintiff's common law tort claims because they were based on the misappropriation of confidential information ).

Plaintiff's unfair competition claim is also preempted.  In Arizona, the common law doctrine of unfair competition "encompasses several tort theories, such as trademark infringement, false advertising, 'palming off,' and misappropriation."  *Fairway Constructors,*

---

F. Supp. 2d 1083, 1092 (N.D. Cal. 2008) (denying default judgment on claims that were preempted under California Business Profession Code § 17200).

*Inc. v. Ahern*, 970 P.2d 954, 956 (Ariz. Ct. App.1998) (internal citations omitted). "[A]n unfair competition claim is preempted unless it alleges elements that make it qualitatively different from a copyright infringement claim." *Id*. Under Arizona law, "[t]he universal test [for unfair competition] is whether the public is likely to be confused." *Doe v. Arizona Hosp. & Healthcare Ass'n*, 2009 WL 1423378, *11 (D. Ariz. Mar.19, 2009) (quoting *Boice v. Stevenson*, 187 P.2d 648, 653 (Ariz.1947)).  Plaintiff's claim of unfair competition is not qualitatively different from his misappropriation of trade secrets claim and thus, it is preempted.

However, HTS's allegation that Boley breached his duty of loyalty to HTS includes conduct other than the misappropriation of information.  Accordingly, the AUTSA does not preempt that claim.

### b.    Breach of the Duty of Loyalty

In Arizona "an employee . . . owes his . . . employer . . . a fiduciary duty," which includes a duty of loyalty.  *McAllister Co. v. Kastella*, 825 P.2d 980, 982-83 (Ariz. Ct. App.1992); *see also Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1085 (9th Cir. 2003) (stating that "nothing in the Restatement indicates . . . that ordinary [or low-level] employees have no duty of loyalty" and finding that superintendent and laborer for sewage repair and maintenance company owed employer a duty of loyalty); *ACT Group Inc. v. Hamlin*, 2012 WL 2976724, *5 (D. Ariz. Jul. 20, 2012) (stating that "[a]n employee clearly owes his employer a 'fiduciary duty of loyalty.'") (quoting *McAllister*, 825 P.2d at 982); Restatement (Third) of Agency § 1.01 (stating that all employees are agents, and that "[a]s agents, all employees owe a duty of loyalty to their employers" regardless of how "ministerial or routinized a work assignment may be").

"Consistent with the fiduciary duty of loyalty, an employee may not . . . compete with his employer concerning the subject matter of the employment" during the period of employment. *Sec. Title Agency, Inc. v. Pope*, 200 P.3d 977, 989 (Ariz. Ct. App. 2008) (citing *McAllister*, 825 P.2d at 982); *see also Evans v. Valley Radiologists, Ltd.*, 619 P.2d 5, 9 (Ariz.1980) (doctor who was hired by radiologists to perform radiation oncology treatments

- 16 -

owed them a duty of loyalty).  Before termination, an employee may make arrangements to compete, but he "cannot properly use confidential information peculiar to his employer's business and acquired therein . . . . He [may not] solicit customers for such rival business before the end of his employment, nor can he properly do similar acts in direct competition with his employer's business."  *McCallister*, 825 P.2d at 982.  "[W]hether an employee's actions constitute a breach of the fiduciary duty of loyalty is a question of fact to be decided by the trier of fact 'based on a consideration of all the circumstances of the case.'"  *Sec. Title*, 200 P.3d at 990 (quoting *Jet Courier Serv. v. Mulei*, 771 P.2d 486, 494 (Colo. 1989)).

Here, the allegations in the Complaint, taken as true on Boley's default, establish that he breached his fiduciary duty of loyalty to HTS by soliciting HTS's customers for the rival business he was forming while still employed by HTS.  (Doc. 8 ¶¶ 5, 30-32 and 38; Doc. 29, Tr. at 50.)  In addition, Boley, who provided technical advice to customers and who was also being groomed in the "clinical" and sales aspects of the business, used HTS's property — including product "kits," company communication resources such as e-mail and phones, company time, and the company name — to gain access to HTS's clients, strengthen his relationships with those clients, and entice them to join his business venture.  (Doc. 8 ¶¶ 25, 31, 38; Doc. 29 at 93-94.); *see Eaton Corp. v. Giere*, 971 F.2d 136, 141 (8th Cir.  1992) (concluding that a product engineer breached his duty of loyalty by soliciting his employer's customers for himself); *ACT Group*, 2012 WL 2976724, at *6 (allegations that sales trainer had created a sales training program that was substantially derived from his employer's proprietary sales training concepts and materials sufficiently alleged a breach of the duty of loyalty).  Accordingly, the second and third *Eitel* factors also favor entry of default judgment as to HTS's claim for breach of the duty of loyalty.

**IV.    Standards for an Award of Damages in a Default Judgment**

Once default is entered, the well-pleaded factual allegations in the complaint are taken as true, except for those relating to the amount of damages. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).  However, "necessary facts not contained in the

pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir.1992) (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir.1978)); *see also DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (for default judgment purposes, a defendant is not held to admit facts that are not well-pled or conclusions of law); 10A Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 3d § 2688, at 63 (1998) (the court must "consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law").

If the court determines that the allegations in the complaint establish liability, it must next determine the "amount and character" of relief to award. 10A Wright, Miller, & Kane, 2688 at 63; *James v. Frame*, 6 F.3d 307, 310 (9th Cir. 1993) (district court has "wide latitude" and discretion in determining the amount of damages to award upon default judgment). Entry of a default judgment for monetary damages is appropriate without a hearing if "the amount claimed is a liquidated sum or capable of mathematical calculation." *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir.1981) (no hearing necessary when documents show that the judgment amount is based upon a definite figure).

Unliquidated and punitive damages, however, require "proving up" at an evidentiary hearing or through other means. *See Black & Decker, Inc. v. All Spares, Inc.*, 2010 WL 3034887, *3 (D. Ariz. Aug. 3, 2010). "[P]laintiff's burden in 'proving up' damages on a motion for default judgment is relatively lenient. If proximate cause is properly alleged in the complaint, it is admitted upon default. Injury is established and plaintiff need only prove that the compensation sought relates to the damages that naturally flow from the injuries pled." *Id.* (citing *Philip Morris USA, Inc. v. Castworld Products, Inc.*, 219 F.R.D. 494, 498 (C.D. Cal. 2003)). "In determining damages, the court can rely on the declarations submitted by the plaintiff." *Philip Morris*, 219 F.R.D. at 498. The plaintiff must provide evidence of its damages, and the damages "must not differ in kind, form, or exceed in amount, what is

1   demanded in the pleadings." Fed. R. Civ. P. 54(c); *see also Freemyer v. Kyrene Village II,*

2   *LLC*, 2011 WL 42681, *3 (D. Ariz. Jan. 6, 2011)).

3   **V.   Remedies**

4         Having found that default judgment should be entered in favor of HTS against Boley in

5   this matter, the Court considers HTS's claimed damages and request for injunctive relief.

6         **A.     Lost Business Opportunity**

7         HTS seeks $382,470.00 in damages for a lost business opportunity withheld from HTS

8   and pursued by Boley in violation of his fiduciary duties and in violation of the AUTSA and

9   the Lanham Act. (Doc. 17, attachment 1 at 18, attachment 6 at 2-3.) HTS alleges that the value

10  of the lost opportunity was $191,235.00 per year and seeks to recover that lost profit for two

11  years.  As discussed below, the Court finds that the request for this amount of damages is

12  speculative and not supported by the record.

13        **1.      The IRIS Clinics Lost Business Opportunity**

14        During the default judgment hearing, HTS's owner, Bortel, testified regarding the lost

15  business opportunity. Bortel testified that on July 16, 2010, while still an HTS employee, Boley

16  received an e-mail from Dr. Patrick Quaid, an HTS client, presenting HTS with a business

17  opportunity to place its products in 300 vision clinics in Canada.[6]  (Bortel Decl. at ¶¶ 10, 18;

18  Doc. 29, Tr. at 60, Hearing Ex. 8.)  Bortel testified that Boley did not share this inquiry with

19  HTS or Bortel and that if Bortel had known about this inquiry, HTS could have acted

20  immediately to bring this opportunity to fruition. (Doc.  29, Tr. at 48-49.)

21        Bortel testified that after Boley resigned from HTS, he became suspicious of Boley's

22  activities after receiving a copy of the Proposal that Boley was circulating; therefore, Bortel

23  searched the computer that Boley used as an employee at HTS and found numerous e-mails in

24  _____

25        [6] The record also includes e-mails between Dr. Quaid and Boley regarding a "BVA idea"
    related to schools and school boards in Canada.  (Hearing Exs.13 and 20.) Bortel testified that
26  Dr. Quaid had previously approached HTS about modifying a screening program for use in
    schools. (Doc. 29, Tr. at 23.) HTS does not seek damages related to that potential opportunity.
27  (Doc. 29, Tr. at 84.)

28

a deleted folder.  (Doc. 29, Tr. 20-21.)  Thus, Bortel learned that on July 15, 2010, Dr. Quaid sent Boley an e-mail about visiting HTS in Arizona for a demonstration of HTS's software. (Hearing Ex. 8.)  Dr. Quaid stated that he was interested in adding "both systems" to his practice and that he would like a demonstration before "committing $7000-$8000" to the in-office systems.  (*Id*.)  Boley responded that HTS did not have a "demonstration room," but that Dr. Quaid could stop by anytime to see HTS's programs. (*Id*.)

On  July 16, 2010, Dr. Quaid replied he was "a part owner of the . . (IRIS The Visual Group),"a 300-doctor network that includes 165 clinics and three laser eye surgery centers. (Doc. 29, Tr. at 101, Hearing Ex. 8.)  Dr. Quaid reiterated his interest in visiting HTS for a "demo session" of HTS's products because he did not "want to give uninformed advice to over 300 of [his] fellow ODs unless [he could] really be knowledgeable in this in-office system." (Hearing Ex. 8; Doc. 29, Tr. at 24 and 30.)

Additional e-mails show that as early as March 2011, before Boley resigned from HTS in July 2011, Boley and Dr. Quaid were engaged in negotiations and planning regarding competing vision services and products.  (Doc. 17, Exs. A and B to attachment 5.)  In a March 24, 2011 e-mail, Dr. Quaid opines that he and Defendant Boley "could come up with some awesome add ons/extras with the HTS program — let me know when you are ready to discuss further — given all that is going on on your end I will leave it in your hands until the dust clears so to speak."  (Hearing Ex. 16.)

E-mail exchanges between Dr. Quaid and Boley in April 2011 indicate that they had been discussing "improving the BVA program," and meeting at the upcoming 2011 College of Vision Development (COVD) conference in Las Vegas to "hash out ideas" about building "your brand" in Canada.  Dr. Quaid and Boley refer to a "deal" that had not been finalized, but that was getting "closer to completion."  (Hearing Exs. 10, 39, 40; Doc. 29 Tr. at 111.)  Dr. Quaid represented that he "could easily multiply your business in Canada 10-fold at least."  (*Id*., Ex. 40.)  The e-mails also indicate that Dr. Quaid and Boley exchanged personal cell and home

phone numbers, and e-mail addresses during April and May 2011. (Hearing Exs. 11, 40, 41-43.)

In early June 2011, Defendant Boley stated that he was "finalizing a few more things." (Hearing Ex. 13.) In late June 2011, Dr. Quaid indicated that he had another optometrist who "will be setting up a doctor account . . . and that he is 100% clear that the kits are always ordered directly by the doctors - not by IRIS." (Hearing Exs. 9 and 12.) Defendant Boley responded that he would e-mail Dr. Quaid his "proposal this afternoon, lets (sic) plan on a phone conversation later this week." (*Id*.) On June 27, 2011, Defendant Boley sent the Proposal to Dr. Quaid, representing that Boley was developing a business to compete with HTS, and projecting that he would be able to take one half of HTS's clients. (Bortel Decl. ¶ 12, Exs. A, C, and D.) The Proposal identified Dr. Quaid as an advisor. (*Id*. at Ex. D)

### 2. HTS's Calculation of Damages for Lost Business Opportunity

HTS characterizes Dr. Quaid's July 16, 2010 e-mail as presenting a business opportunity for HTS to place its vision therapy products in all 165 IRIS clinics in Canada. (Doc. 29, Tr. at 23, 30.) HTS contends that rather than sharing that opportunity with HTS, Boley worked with Dr. Quaid to develop NuVision and to later exploit the IRIS opportunity. (Doc. 29, Tr. at 24, 32.) Bortel calculated HTS's damages from the lost IRIS opportunity based on HTS's average yearly sales per clinic in Canada ($1,159.00),[7] multiplied by the number of IRIS clinics (165), for two years (2) from July 16, 2010, the date of Dr. Quaid's inquiry, until the date HTS filed suit in 2012. (Bortel Decl. at ¶18.) Thus, Plaintiff calculates the damages for this lost business opportunity as *$1159.00 x 165 x 2 = $382,470.00*.[8]

---

[7] Bortel testified that he sells products to 42 or 43 clinics in Canada and that the average yearly sales is "about $1,150" per clinic. (Doc. 29, Tr. at 63.) He also testified that this "may be a misleading number" because sales vary greatly by doctor, depending on how aggressively or effectively the doctors sell the product to their patients. (*Id.*)

[8] HTS further asserts that this figure is low because Boley's Proposal suggested that the IRIS business opportunity was worth $875,000.00 based on the assumption that each IRIS clinic would buy $50,000.00 worth of vision therapy products annually. (Bortel Decl. ¶ 18, Ex. D.)

The full amount of damages that HTS seeks based on the lost IRIS opportunity are not sufficiently supported and therefore are speculative. "It is well settled that conjecture or speculation cannot provide the basis for an award of damages." *Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 680 P.2d 1235, 1247 (Ariz. Ct. App.1984). "Damages that are speculative, remote or uncertain may not form the basis of a judgment." *Coury Bros. Ranches, Inc. v. Ellsworth*, 446 P.2d 458 (Ariz. 1968). Although the Complaint sufficiently alleges that Boley redirected a business opportunity that would have gone to HTS but for Boley's breach of his fiduciary duties, HTS has not sufficiently established the amount of damages alleged, $191,235.00 per year for two years.

Bortel testified that if Defendant Boley had shared Dr. Quaid's July 2010 e-mail, he would have acted on the proposal that day and that "it would have come to fruition" because HTS had the vision therapy products available to place in the IRIS clinics and Dr. Quaid had the inclination and the ability to do so. (Doc. 29, Tr. at 49, 65.) However, Bortel later testified that HTS still sells Dr. Quaid an average of $10,000.00 worth of HTS products annually for his own clinic and that Dr. Quaid has not contacted HTS to propose placing HTS products in the IRIS clinics. (*Id.* at 66, 75, 80.) In addition, Bortel testified that Boley and Dr. Quaid have not yet succeeded in selling vision therapy products in the 165 IRIS clinics in Canada because they do not have product. (*Id.* at 61.)

Bortel also testified that he did not know the number or identity of the IRIS owners, he did not know the extent of Dr. Quaid's ownership interest in IRIS, and he did not have any information that would suggest that those other owners had any interest in HTS products or that they would have agreed to purchase HTS products for all 165 IRIS clinics. (*Id.* at 73, 100.) Bortel did not know if Dr. Quaid had the ability to unilaterally decide to purchase the HTS vision

---

Bortel, however, noted that the Proposal overstates the number of IRIS clinics in 2011 as 175, rather than 165, and that it appears to overstate Dr. Quaid's annual purchases as $50,000 per year, rather than $10,000.00 (Doc. 29, Tr. at 87.) Bortel also agreed that the Proposal was a "sales pitch" and stated that he did not rely upon the projected revenues in the Proposal when calculating the value of the lost business opportunity. (*Id.* at 87-88.)

1    products for the IRIS clinics. (*Id.* at 100.) He speculated that Dr. Quaid would have had to make

2    a proposal to the other doctors "that made sense to them." (Doc. 29 at 100.)

3          In June 2011, Dr. Quaid sent an e-mail to Boley stating that he had another optometrist

4    who "will be setting up a doctor account . . . and that he is 100% clear that the kits are always

5    ordered directly by the doctors — not by IRIS." (Hearing Exs. 9 and 12.) Although this e-mail

6    indicates that at least one doctor in the IRIS group may have been interested in ordering  "kits"

7    in 2011, it also indicates that the individual doctors, not IRIS or Dr. Quaid, ordered product for

8    their clinics.

9          Bortel testified that he believed that Dr. Quaid could get HTS's products in some or most

10   of the IRIS clinics based on Dr. Quaid's confidence in his e-mails to Boley. (Doc. 29, Tr. at

11   109-10.) Bortel relied, in part, on an April 19, 2011 e-mail from Dr. Quaid to Boley stating that

12   he had been giving continuing education lectures to IRIS doctors about vision therapy products

13   and stated that he "could easily multiply your business in Canada tenfold at least." (*Id.* at 110,

14   Hearing Ex. 40.) Bortel testified, however, that continuing education lectures were not "sales

15   presentations."  While Dr. Quaid may have given the IRIS doctors information about a

16   "clinically viable" and "economically viable" vision product, the Court finds that Dr. Quaid's

17   purported enthusiasm about the product does not indicate that any of the 300 doctors in the IRIS

18   Vision Group would have purchased the vision therapy products.  Furthermore, Bortel's

19   statements regarding Dr. Quaid's authority to direct or persuade the IRIS clinic owners to

20   purchase HTS products carry little weight. *See Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412

21   (9th Cir. 1995) (declarations on information and belief are entitled to no weight when declarant

22   lacks personal knowledge).

23         In Arizona, "'certainty in amount' of damages is not essential to recovery when the [f]act

24   of damage is proven." *Harris Cattle Co. v. Paradise Motors, Inc.*, 448 P.2d 866, 868 (Ariz.

25   1968) (quoting *Story Parchment Co. v. Patterson Paper Co.*, 282 U.S. 555 (1931)).  However,

26   when seeking damages based on loss of business or profits based on tortious misconduct, the

27   plaintiff "must show the amount of [its] damages with reasonable certainty and a reasonable

28

degree of accuracy, and . . . the testimony establishing the loss must be free of speculation and conjecture." *Harris Cattle*, 448 P.2d at 868 (quoting *Sposari v. Matt Malaspina and Co.*, 388 P.2d 970 (Wash. 1964)).

HTS's request for $382,470.00 in damages based on the lost opportunity to place HTS products in 165 IRIS clinics is too speculative to support an award of the full amount of damages requested. *See Lindy*, 982 F.2d at 1407 (plaintiff must provide a "reasonable basis for computation" of its lost profit); *eAdGear, Inc. v. Liu*, 2012 WL 2367805, *18 (N.D. Cal. June 21, 2012) (declining to award the amount of compensatory damages requested for a violation of the Lanham Act because "the evidence provided [did] not seem to prove the specific amount requested with sufficiently reasonable certainty"). HTS, however, did establish that it would have immediately responded to Dr. Quaid's inquiry, if Boley had sent the inquiry to Bortel. (Doc. 29, Tr. at 64-65, 71.) HTS also established that it had the ability to quickly respond to much larger product orders from Dr. Quaid. (*Id.* at 75-76.) Therefore, the Court concludes that HTS has established that it lost a business opportunity as a result of Boley's breach of his fiduciary duty of loyalty, and his violations of the AUTSA and the Lanham Act.

### 3.    Recommended Damages for Lost Business Opportunity

Under the AUTSA, plaintiffs may recover damages for misappropriation of a trade secret. Ariz. Rev. Stat. § 44-401-07. A plaintiff may recover "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Ariz. Rev. Stat. § 44-403(A). Similarly, the Lanham Act, 15 U.S.C. § 1117(a), provides for an award, based on equitable considerations, of "any damages sustained by the plaintiff . . . ." A plaintiff must prove both the fact and the amount of damage. *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 892 F.2d 1400, 1407 (9th Cir. 1993) (citing 2 J. Thomas McCarthy, Trademarks and Unfair Competition § 30:27, at 511 (2d ed. 1984)). "Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement." *Id.* An award based on plaintiff's damages requires some showing of actual loss. *Lindy Pen*, 982 F.2d at 1408 (citing

*Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 642 (D.C. Cir. 1982)). A plaintiff is only entitled to damages resulting from the infringement, and not a windfall. *Bandag, Inc. v. Al Bolster's Tire Stores, Inc.*, 750 F.2d 903, 918 (Fed. Cir. 1984).

Thus, to determine the value of this lost business opportunity, the Court must determine how many doctors in the IRIS clinics would have agreed to present vision therapy products to their patients and how many patients would have agreed to purchase those products. Bortel testified that only 5% to 7% of optometrists offer vision therapy services to their patients and so "it's really a closed audience." (Doc. 29, Tr. at 11.) He also testified that approximately 10% of patients will have convergence insufficiency and need vision therapy. (*Id.* at 76.) Therefore, he explained that if a two-doctor clinic, such as the IRIS clinics, were working at capacity, they would see forty patients per day, and 10%, or four, of those patients would need vision therapy. (*Id.* at 76-77.) He explained, however, that the number of those patients who would purchase vision therapy products would depend upon the doctors' ability to sell the product. (*Id.* at 77.) Some doctors sell three to five products per month; others, like Dr. Quaid, sell a much higher number. (*Id.*)

Because of these variables, to predict the amount of additional annual sales from each IRIS clinic, Bortel averaged the amount of HTS's sales in 2011 to its existing doctor-clients in Canadian clinics as $1,159.00; Bortel testified that 2011 was an average and representative sales year. (*Id.* at 80.) Because this prediction is based upon information drawn from HTS's actual sales experience in Canadian clinics, the Court finds that $1,159.00 per year is a reasonable estimate for the value of the lost business opportunity for annual sales in an IRIS clinic.[9]

The record, however, does not support HTS's claim that doctors in all 165 IRIS clinics would have agreed to sell vision therapy products. Instead, based on Bortel's testimony that only

---

[9]  Although Bortel testified that he believed the Canadian clinics in which he sold products were private practices, as opposed to the IRIS clinics, which he believed were commercial outlets, he did not specify the number of doctors purchasing vision therapy products in each clinic. (Doc. 29, Tr. at 79.) Therefore, the Court will use Bortel's $1,159.00 yearly sales average as a per clinic average, not a per doctor average.

5% to 7% of optometrists offer vision therapy services to their patients, the Court concludes that even with Dr. Quaid's assistance, HTS would not have been able convince more than 5% to 7% of the IRIS clinics to offer vision therapy products to their patients.  Assuming the higher number, 7%, based upon Dr. Quaid's relationship with the IRIS clinics, the value of this lost business opportunity was $13,386.45 per year.[10]  HTS seeks damages for the lost business opportunity for two years, from July 2010 until it filed suit on April 23, 2012.  HTS does not provide any basis for requesting two years of damages, but the Court finds that HTS's record as a successful business selling vision therapy products for over thirty years supports the finding that once HTS established a relationship with the IRIS clinics, it would have been able to maintain that sales relationship.  Therefore, the Court recommends an award of damages for the two years HTS has requested for a total of $26,772.90 for the lost business opportunity.

**B.     Value of Misappropriated HTS Products**

The Complaint also alleges that Boley gave "free HTS product to existing HTS clients to encourage them to work with" Boley in starting NuVision and that Boley did not have authorization to give away HTS products.  (Doc. 8 ¶ 69; Doc. 29, Tr. at 46.)  HTS seeks $10,216.00 in damages for value of these products.  HTS argues that these damages are recoverable based on Boley's breach of his fiduciary duties to HTS and his violation of the AUTSA, Ariz. Rev. Stat. § 44-401.[11]  (Doc. 17, attachments 4 and 6; Doc. 29, Tr. at 40, 48, 99 at 102.)

The AUTSA provides in part that "[d]amages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."  Ariz. Rev. Stat. § 44-403(A).  A "[p]laintiff's burden in

---

[10]  This figure is based upon 7% of the 165 IRIS clinics selling $1,159.00 in vision therapy products per year, or *165 x .07 x 1,159 = $13,386.45.*

[11]  HTS also claims that it is entitled to such damages based on Boley's unfair competition.  Because that claim is preempted by the AUTSA, the Court need not determine whether damages for HTS products Boley gave away are recoverable on that basis.

'proving up' damages on a motion for default judgment is relatively lenient.  If proximate cause is properly alleged in the complaint, it is admitted upon default.  Injury is established and plaintiff need only prove that the compensation sought relates to the damages that naturally flow from the injuries pled." *Castworld Prods,* 219 F.R.D. at 498 (citing *Cripps,* 908 F.2d at 1267).

During the default judgment hearing, Bortel testified Boley provided HTS products to Dr. Quaid without charging him for these products.  (Doc. 29, Tr. at 25, 26; Bortel Decl. ¶ 16, Ex. E.)  Bortel testified that the scope of Defendant Boley's job did not include offering free products to HTS clients.  (Doc. 29, Tr. at 25.)  Bortel further testified that "no one on [his] staff can give away free product without [his] consent."  (*Id.* at 46.)  HTS also asserts that Boley modified product HASP keys (security devices) and sent them to Dr. Quaid to allow him to operate HTS software on a second computer without the need to purchase a second HTS VTS3, a product that sells for $4,495.00.  (Doc. 17, attachment 4 at 6; Doc. 29, Tr. at 25 and 44; Hearing Exs. 41, 43 and 44; Bortel Decl. ¶¶ 16-17, Ex. E.)  Bortel explained that the HTS product that is sent home with patients — the Home Therapy System or HTS iNet — requires a user ID and passcode (HTS codes) to activate the product.[12]  (Doc. 29, Tr. at 44.)

HTS alleges that Boley gave products to Dr. Quaid to build a relationship with him and encourage him to participate in the creation of Boley's new business, NuVision.  The NuVision business Proposal identifies Dr. Quaid as an advisor and there are numerous e-mails between Boley and Dr. Quaid referring to the new business.  (Bortel Decl., Ex. E.)  The Court finds that damages for the value of the HTS products that Boley gave to Dr. Quaid "naturally flow" from Boley's breach of his duty of loyalty to HTS and from his violation of Ariz. Rev. Stat. § 44-401.  *See Castworld Products*, 219 F.R.D. at 498 (citing *Cripps*, 980 F.2d at 1267).  Therefore, the

---

[12]  HTS's materials describe the HTS iNet as a computerized home therapy system designed to improve the symptoms related to "near point visual tasks, such as reading or working on a computer." (Doc. 8, Ex. A.)  The HTS product is sold in the form of a DVD.  (*Id*; Doc. 29, Tr. at 11.)

- 27 -

Court must determine the amount of damages resulting from Boley's breach of his duty of loyalty and his violation of Ariz. Rev. Stat. § 44-401.

HTS seeks $10,216.00 in damages for value of the products that Boley gave to Dr. Quaid. (Doc. 17, attachment 1 at 17.)  Bortel testified that this figure is based on the e-mails between Boley and Dr. Quaid that identify the type and number of products that Boley gave to Dr. Quaid and HTS's sales price for those products. (Doc. 29, Tr. at 99.) Based on Bortel's declaration, his testimony at the hearing, and the evidence admitted at that hearing, the Court finds that Boley, without authorization, gave Dr. Quaid the following HTS products: (1) thirteen BVA kits that sell for  $99.95 each ($1,299.35);[13] (2) two projectors that each sell for $750.00;[14] (3) one "CPT" program that sells for $2,700.00;[15] and (4) an HTS code that obviated the need for Dr. Quaid to purchase a second "computer orthoptor," the HTS VTS3, which "sells for $4,495.00." (Doc. 29

---

[13] E-mails between Defendant Boley and Dr. Quaid include the following information: (1) a March 24, 2011 e-mail from Boley to Dr. Quaid indicating that Boley sent "3 BVA kits at no charge," (Bortel Decl., Ex. E.); (2) an April 13, 2011 e-mail from Boley to Dr. Quaid stating that Boley sent three "BVA kits no charge," (*Id.*); (3) a May 26, 2011 e-mail between Boley and Dr. Quaid indicating that Boley sent two free BVA kits, (*Id.*); (4) a June 8, 2011 e-mail stating that Boley sent Dr. Quaid "3 BVA . . . no charge," (*Id.*); and (5) a June 27, 2011 e-mail stating that Boley sent Dr. Quaid "2 BVA kits no charge." (*Id.*; Hearing Exs. 16, 10, 14, 13, 20.)

[14] Bortel testified that Boley gave Dr. Quaid one projector and, after that one broke, gave him a second projector.  (Doc. 29, Tr. at 25-26; Bortel Decl. at 21, Ex. E.)  However, the e-mails between Boley and Dr. Quaid refer only to one projector that Dr. Quaid picked up from HTS in Arizona. (*Id.*, Ex. E; Doc. 29 at 25.)  However, because Plaintiff may rely on declarations to establish its damages and the Court found Bortel's testimony credible, the Court finds that HTS has sufficiently established that Boley gave Dr. Quaid two projectors without authorization.

[15] Bortel testified that Boley made a fake invoice for the CPT so Dr. Quaid could deduct the "cost" from his taxes.  (Doc. 29, Tr. at 26-29.)  Bortel found the invoice as a pdf attached to an e-mail Boley sent Dr. Quaid and determined it was fake because it was not in HTS's accounting database as it would have been if it had been properly generated.  (*Id.* at 26-29.)  Bortel described the differences between a legitimate invoice that includes the notation "p-cc," which means the invoice was paid by a credit card (Hearing Ex. 37), and a falsified invoice (Hearing Ex. 38) that includes the notation "X" meaning it was not paid because it was not submitted to HTS's accounting department.  (*Id.*)

, Tr. at 25.)    The total price for these products equals $9,994.35.[16]    Therefore, the Court recommends that the default judgment include an award of $9,994.35 in damages for the value of the HTS products that Boley gave away without authorization.

### C.    Reimbursement of Boley's Compensation

HTS seeks $98,914.00 in damages for reimbursement of compensation paid to Boley while he was in breach of his fiduciary duty of loyalty, from July 16, 2010 through July 6, 2011, and for his violation of Ariz. Rev. Stat. § 44-401.[17]    (Doc. 8 at 15; Doc. 17, attachment 1 at 18 and attachment 6; Doc. 30 at 4.)    To support its claim for these damages, HTS relies on the Restatement (Second) of Agency § 469 (1958), which provides that "[a]n agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty." Furthermore, "if such conduct constitutes a willful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned."    *See* Restatement (Third) of Agency § 8.01 cmt. d (2006).

In the absence of contrary authority, Arizona courts follow the Restatement as the proper statement of law.    *See Johnson v. Pac. Lighting Land Co.*, 817 F.2d 601, 607(9th Cir. 1987) (discussing Restatement (Second) of Agency § 469) (citing *Green Acres Trust v. London*, 688 P.2d 658, 669 (Ariz. Ct. App.1983), *reversed on other grounds*, 688 P.2d 617 (1984)).    Under Arizona, law, "if an agent betrays his principal, such misconduct and breach of duty results in the agent's losing his right to compensation for services to which he would otherwise be entitled."    *See Haymes v. Rogers*, 222 P.2d 789, 790 (Ariz. 1950) (citing  Restatement (Second) of Agency § 469).    In addition, the Restatement provides for the recovery of all compensation

---

[16] Because HTS did not itemize its damages for the misappropriated products, the Court cannot account for the additional $221.65 (*$10,216 - $9,994.35 = $221.65*) that HTS seeks.

[17]    In the Complaint, HTS seeks $453,346.00 in damages for reimbursement of compensation paid to Boley.  (Doc. 8 at 15.)  However, because HTS has not substantiated its request for that amount and its proposed default judgment seeks $98,914.00 for reimbursement of compensation paid to Boley, the Court considers HTS's request for $98,914.00.  (Doc. 17, attachment 6.)

paid to an employee during a period of disloyalty as damages.  *See Janssens v. Freedom Med., Inc.*, 2011 WL 1642575, *6 (D. Md. Apr. 29, 2011) (noting that Restatement (Third) Agency § 8.01 cmt.(d)(2) provides that the court has "discretion to mandate forfeiture of *all* compensation paid during a period of disloyalty") (emphasis in original); *Wilshire Oil Co. of Tex. v. Rife*, 406 F.2d 1061, 1062-63 (10th Cir. 1969) (relying on Restatement (Second) Agency § 469 to award corporation damages in the form of compensation paid to corporate officer who had breached his duty of loyalty by participating in a competing corporation); *J.C. Peacock, Inc. v. Hasko*, 16 Cal. Rptr. 518, 522 (Cal. App. 1961) (employee who violates fundamental duty of loyalty cannot recover even for services he has rendered).

Courts have invoked § 403 of the Restatement (Second) of Agency to award "disgorgement of salary and benefits" as damages for an employee's breach of the duty of loyalty.  *See Serv. Emp. Int'l Union v. Colcord*, 72 Cal. Rptr.3d 763, 769 (Cal. App. 2008) (award of damages constituting salary and benefits paid to former employee during time he was secretly competing with employer was warranted); *LogicLink, Inc. v. Keylink Serv. Solutions, Inc.*, 2009 WL 764526, *9 (C.D. Cal. Mar. 19, 2009) (under § 403, employer was entitled to damages in the amount of employee's wages paid while he was working for his own personal benefit).

In *Service Employees*, the court found that the employee "supported himself with compensation he received from [his employer] while he plotted against its interests.  Had he resigned as soon as he embarked on competition against [his employer], or had . . . disclosed defendants' activities, [his employer] would not have continued to pay him." 72 Cal. Rptr. 3d at 769.  Thus, the court concluded that defendant's salary and benefits were "damages directly flowing from the breach of [his] fiduciary duties."  *Id*.  The court further noted that if the employer had incurred the cost of hiring a replacement employee, it would have had that employees "undivided loyalty in return.  [Defendant's] conduct deprived [the employer] of that vital benefit."  *Id*. at 769-70.

Similar to *Service Employees*, Boley developed a competing company, made plans with one of HTS's existing clients, gave away HTS's products to curry favor with one potential investor or business partner, and solicited investors for his competing business while employed by HTS.  Had Boley honored his duty of loyalty to HTS by disclosing his activities, it is reasonable to assume that HTS would not have continued to pay him.  *See id.* (affirming award of salary and benefits during the time an employee was organizing a competing union noting that employer would have stopped paying employee if he had disclosed his disloyal conduct); *see also Purolator Prods., Inc. v. Torite Ind., Inc*., 413 F.2d 989, 990 (9th Cir. 1969) (affirming award of damages including employees' salary from employment during period when they were secretly competing with the employer).  Thus, an award of damages for Boley's salary "directly flow[s] from the breach" of his duty of loyalty.  Further, as in *Service Employees*, although HTS might have had to pay a similar salary to a replacement employee, it would have had that replacement's undivided loyalty.  *See id.*  Boley's misconduct deprived HTS of that benefit.

Thus, the Court must determine the period of time in which Boley was an HTS employee, but was working against HTS's interests and for his own interests. Boley was an HTS employee from May 2005 until July 6, 2011.  (Doc. 8 ¶¶ 5, 20, 21.)  The record indicates that Boley's disloyal conduct began as early as July 16, 2010, which is a year before Boley resigned from HTS.  (Hearing Exs. 8 and 9.)  Although there is a gap between Boley's and Dr. Quaid's July 16, 2010 e-mail and their next e-mail exchange in spring 2011, there is evidence that Boley took steps to hide his conduct from HTS by deleting e-mails from his workstation (Doc. 29, Tr. at 21), and Boley's default impeded discovery on the full scope of his disloyalty, thus, any gaps in the evidence are resolved against Boley.  *See Taylor Made Golf Co., Inc. v. Carsten Sports, Ltd.*, 175 F.R.D. 658, 663 (S.D. Cal. 1997) ("doubts about the actual assessment of damages will be resolved against the party who frustrates the proof of such, and the factfinder may calculate damages at the highest reasonably ascertainable value").  Accordingly, the Court will determine these damages based upon the amount of Boley's compensation from July 1, 2010 through his last day of employment on July 6, 2011.

HTS asserts that it paid Boley $76,390.20 for all of 2010.  Boley's 2010 W-2 form indicates that HTS paid Boley $53,155.20.  (Hearing Ex. 29.)   During the default judgment hearing, Bortel testified that RKB Properties, LLC, another company that Bortel owns, paid the remaining $23,235.00.  (Doc. 29, Tr. at 92.)  Bortel explained that he paid part of Boley's compensation from RKB Properties, LLC, because he wanted to give Boley a raise, but he did not want to do so using HTS's checking accounts because HTS is a small company and he wanted to avoid the "discord in the office" that would result if everyone knew Boley had received a raise.  (Doc. 29, Tr. at 91.)  Thus, the 2010 W-2 for Boley and Bortel's testimony establish that Boley's compensation for part of 2010, from July 1 to December 31, 2010, was $38,195.10.  (Doc. 30 at 7.)

HTS asserts that it paid Boley $50,742.32 in wages in 2011.  Boley's 2011 W-2 indicates that HTS paid him $39,938.32.  (Hearing Ex. 30.)  Bortel testified that RKB Properties, LLC paid Boley an additional $10,804.00 in 2011.  (Doc. 29, Tr. at 92.)  Combining these amounts for 2011, and the amounts paid to Boley from July to December 2010, HTS seeks $88,937.42 in reimbursement for wages paid to Boley from July 1, 2010 through July 6, 2011.  Bortel, however, testified in his declaration and at the hearing that Boley's total compensation from July 2010 to July 2011 was $98, 914.00.  (Bortel Decl. ¶ 19; Doc. 29, Tr. at 89-92.)

In its Supplemental Brief, HTS explained that the additional $9,977.50 in damages for compensation paid to Boley in 2010 and 2011, although not included in  Boley's W-2s, or explained in Bortel's declaration, or in his testimony at the hearing, was part of a simplified employee retirement plan (SEP).  (Doc. 30 at 7.)  To support these additional damages, HTS relies upon an unsworn statement from counsel in Plaintiff's supplemental brief.  Documentation or other evidence of these additional damages was available to HTS without discovery. Therefore,  the Court declines to include as damages the additional $9,977.50 that HTS asserts it paid to Boley as part of its SEP because HTS did not meet its burden of proving these damages. Accordingly, the Court recommends an award of damages in the amount of $88,937.42

for compensation and benefits that HTS paid to Boley while he was engaging in disloyal conduct.

### D. Miscellaneous Damages

HTS requests $2,145.00 in miscellaneous damages. Specifically, HTS seeks: (1) $1,670.00 for the cost of hiring an accounting service to gather financial information in response to Defendant Boley's purported interest in purchasing HTS in late 2010; (2) $250.00 for the cost of hiring a private investigator to locate Defendant Boley for service of process; and (3) $225.00 for a non-refundable airline ticket HTS purchased to send Boley to a conference in Las Vegas that he did not attend because he resigned before the date of the conference. (Bortel Decl. ¶¶ 20-22; Doc. 17, attachment 6.)

HTS states that it incurred $1,670.00 in accounting expenses to "to identify, track, and respond to Defendant Boley's wrongful activities . . . includ[ing] activities associated with gathering financial information to respond to Defendant Boley's above-noted interest in purchasing HTS in late June 2010." (Bortel Decl. ¶ 20.) Although HTS has not itemized these expenses, during the default judgment hearing, Bortel clarified that the "vast majority" of the accounting expenses related to HTS's negotiations with Boley regarding his interest in purchasing HTS and about one-hundred dollars related to the cost of providing copies of Boley's W-2s for purposes of establishing HTS's damages. (Doc. 29, Tr. at 99-100.)

The Complaint, however, does not sufficiently allege that these damages were proximately caused by Boley's misconduct. Bortel testified that Boley was interested in buying HTS, but when he could not obtain funding for the purchase he went to "Plan B," which was "to go to Dr. Quaid, come up with their own plan, [and] raise money themselves to produce the product themselves." (Doc. 29, Tr. at 82-83.) Thus, Bortel's testimony suggests that he believed that Boley had a legitimate interest in purchasing HTS, until he could not obtain financing to do so. (*Id.* at 32, 50, 68.) Therefore, HTS has not established that its accounting expense incurred as part of the negotiation for the potential sale of the company were related to Boley's misconduct. Additionally, to the extent that HTS incurred accounting expenses to determine its

damages in this case, those expenses appear to be a cost, not damages.  Accordingly, the Court declines to recommend an award of damages for HTS's accounting expenses.

HTS also seeks to recover $250.00 for a private investigator to locate Boley for service of process.  Although HTS characterizes this sum as damages, it appears to be a cost.  Federal Rule of Civil Procedure 54(d) creates a presumption that the prevailing party recovers its costs.  However, Rule 54(d) authorizes the court to award only those expenses enumerated in 28 U.S.C. § 1920.  Consistent with Rule 54(d) and § 1920, Local Rule of Civil Procedure 54.1(e) provides for the recovery of costs for "service fees."  The cost of hiring an investigator to locate Boley for service of process is not a "service fee," rather it is an investigatory fee that is generally not recoverable.

Furthermore, HTS does not seek this cost as part of its request for attorney's fees and has not shown that it is the prevailing practice in Phoenix for counsel to bill investigatory fees for locating a defendant separately from their hourly rates.  (Johnson Decl.)[16]  *See State of Illinois v. Sangamo Const. Co.*, 657 F.2d 855, 864  (7th Cir. 1981) (investigatory services are not recoverable as costs); *Premier Pool Mgmnt Corp. v. Lusk*, 2012 WL 1593206, *10 (E.D. Cal. 2012) (noting that attorney's fees under the Lanham Act may also include reasonable costs that a party cannot recover as the prevailing party because the phrase "reasonable attorney's fees" is interpreted to include certain non-taxable litigation expenses.  However, such costs can be awarded only if it is the prevailing practice in the relevant community for the attorneys to bill these costs separately from their hourly rates).  Therefore, the Court does not include these costs in the recommended damages.

HTS also seeks $225.00 for a non-refundable airline ticket it purchased to send Boley to the annual COVD conference in Las Vegas in 2011, which he did not attend because he resigned before the date of the conference.  (Bortel Decl. ¶¶ 20-22; Doc. 29, Tr. at 111.)  During the

---

[16] Citations to "Johnson Decl." are to the "Declaration of Jeffrey W. Johnson in Support of Plaintiff HTS, Inc.'s Motion for Entry of Default Against Defendant David Boley." (Doc. 17, attachment 2.)

default judgment hearing, HTS's counsel implied that Boley used the airline ticket "to meet with Quaid to discuss setting up" business. (Doc. 29, Tr. at 102.) Bortel's declaration, however, states that Boley did not attend the conference and did not use the ticket. Regardless of whether Boley used the ticket, the Court finds that HTS's purchase of a non-refundable airline ticket for Boley to attend a trade conference on behalf of HTS resulted in "damages that naturally flow" from Boley's breach of his fiduciary duty of loyalty. *See Black & Decker*, 2010 WL 3034887 at *3. Had HTS been aware of Boley's disloyal contact, it presumably would not have purchased an airline ticket to send him to a conference on HTS's behalf. Accordingly, the Court recommends that HTS be awarded $225.00 in damages for the non-refundable airline ticket.

### E. Exemplary Damages

Finally, HTS seeks exemplary damages pursuant to Ariz. Rev. Stat. § 44-403(B) for Boley's misappropriation of trade secrets. (Doc. 30 at 8.) Specifically, HTS requests as exemplary damages that the Court double the award for HTS's requested compensatory damages for lost business opportunity ($382,470.00), miscellaneous damages ($2,145.00), and the value of HTS products given to Dr. Quaid ($10,216.00). HTS asserts that these damages resulted at least in part from Boley's misappropriation of trade secrets and therefore doubling these damages results in an appropriate award of exemplary damages. (Doc. 30 at 8-10.) As previously stated, the Court recommends an award of $26,772.90 in damages for the lost business opportunity, $225.00 in miscellaneous damages, and $9,994.35 for the value of misappropriated HTS products. Because the $26,772.90 in damages for the lost business opportunity resulted in part from Boley's misappropriation of trade secrets, the Court will consider whether to award exemplary damages of up to twice that amount. However, the $225.00 in damages for the plane ticket to the COVD convention, and the $9,994.35 in damages for the value of the HTS's products, more logically flow from Boley's breach of his duty of loyalty. Accordingly, § 44-403(B) does not apply to those damages.

Under the AUTSA, a court may award exemplary damages upon a showing of willful and malicious misappropriation. *See* Ariz. Rev. Stat. § 44-403(B) ("if willful and malicious

misappropriation exists, the court may award exemplary damages in an amount not exceeding twice the award made under subsection A"). The award of exemplary damages is discretionary. *See Merch. Trans. Sys., Inc. v. Nelcela, Inc.*, 2010 WL 1337711, at *8 (D. Ariz. Apr. 2, 2010) (noting that court had discretion to award exemplary damages pursuant to Ariz. Rev. Stat. § 44-403 and awarding exemplary damages based on jury's finding that defendant's misappropriation of trade secrets was willful). Arizona has adopted the Uniform Trade Secrets Act and § 44-403 is based on § 3 of the uniform act. *See* Unif. Trade Secrets Act § 3 (2012); *Householder Group, LLP v. VanMason, 2012 WL 4513635*, *5 (D. Ariz. Sept. 30, 2012) (Arizona has adopted the UTSA).

Neither the AUTSA nor the UTSA define the phrase "wilful and malicious," and HTS has not cited any Arizona authority directly on point defining that term in the context of trade secrets. Because the AUTSA damages provision is based on the UTSA, the Court considers as instructive decisions from other jurisdictions that have adopted substantially the same provision of the UTSA, such as Pennsylvania. The Pennsylvania Uniform Trade Secrets Act defines "willful and malicious" as "[s]uch intentional acts or gross neglect of duty as to evince a reckless indifference to the rights of others on the part of the wrongdoer, and an entire want of care so as to raise the presumption that the person at fault is conscious of the consequences of his carelessness." 12 Pa.C.S.A. § 5302.

The Court agrees that HTS has shown that Boley's misconduct satisfies this definition. First, HTS possessed trade secret information including customer contact information and financial information that it took reasonable efforts to keep confidential. HTS derived substantial economic advantage from the confidential nature of that information. (Doc. 8 ¶¶ 3, 4, 22, 61, 62.) Boley admitted by default that he had access to that confidential information for limited purposes only and that he provided HTS's confidential information, including client and financial information, to unauthorized parties to secure business for a company he was forming. (Doc. 8 ¶¶ 5, 22, 29-34, 38, 63.) Boley also admitted on default that his misappropriation of HTS's trade secrets would harm HTS. (Doc. 8 ¶¶ 5, 30-34, 38, 63.)

The record also reflects that Boley took steps to conceal his wrongful conduct with respect to HTS's trade secrets by deleting e-mail communications between himself and HTS's client, Dr. Quaid. (Doc. 29 at 21.) Additionally, the record reflects that, without authorization, on December 20, 2010 Boley copied the HTS customer database, that included key customer information, from a laptop computer. (Doc. 30 at 35-41.) The record also reflects that Boley had the laptop computer in his possession from April 2011 until "a number of days" after he left HTS's employ. (Doc. 29 at 41.) Therefore, the record reflects that Boley's misappropriation of HTS's trade secrets was not accidental.

These facts, combined with the Proposal for Nuvision, which asserted that Boley could take one-half of HTS's customers, support a finding that Boley's misappropriation of trade secrets was part of a purposeful plan to build a competing business using HTS's trade secrets to the detriment of HTS. Accordingly, the Court recommends an award exemplary damages in the amount of $53,545.80, which is twice the amount of the damages recommended for lost business opportunity.

### F.    Injunctive Relief

HTS seeks injunctive relief under the Lanham Act, 15 U.S.C. § 1116(a). Injunctive relief is the preferred remedy in trademark cases because "there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988). Under the Lanham Act, a district court has the power to grant injunctions according to the rules of equity, and on such terms as the court deems reasonable, to prevent the violation of a trademark holder's rights. *See* 15 U.S.C. §§ 1116(a), 1125(a); *see also Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1314 (9th Cir.1997); *Interstellar Starship Servs, Ltd. v. Epix, Inc.*, 304 F.3d 936, 948 (9th Cir. 2002). Injunctive relief is available in a default judgment setting. *See Philip Morris*, 219 F.R.D. 494. However, a plaintiff is not entitled to an injunction as a matter of course; rather, when a trademark holder demonstrates ongoing infringement of its marks, an injunction is appropriate. *Pepsico Inc.*, 238 F. Supp. 2d at 1177–78 (internal citations omitted).

Here, HTS alleges that Boley's "unauthorized use of the Infringing Mark is . . . likely to cause confusion, mistake, and deception as to the source of origin of its goods and services, and is . . . likely to falsely suggest a sponsorship, connection, license or association of Defendants and/or Defendants' products with Plaintiff."  (Doc. 8 ¶ 40.)   Further, HTS alleges that "Defendants' activities have irreparably harmed, and if not enjoined, will continue to irreparably harm Plaintiff and Plaintiff's Mark."  (*Id.* at ¶ 43.)   HTS also alleges that "Defendants' acts" have damaged "the goodwill associated with Plaintiff's Mark" and that Plaintiff does not have an adequate "remedy at law."  (*Id.* at ¶¶ 52, 54.)   Taking HTS's allegations as true, the Court finds good cause exists to issue an injunction.

HTS has submitted a proposed injunction order that sets forth the injunctive relief it requests. (Doc. 17, attachment 7.)  The Court, however, finds that HTS's requested injunctive relief is too broad and is not appropriately defined.  Therefore, the Court recommends an order for injunctive relief that specifically enjoins Boley from using the infringing Mark in the form shown in the attachments to the Complaint,  (Doc. 8, Exs. C and D), and that enjoins Boley from possessing, using, or disclosing any of HTS's confidential information, specifically HTS's client identification information, client contact information, and financial information.  The Court recommends an order for injunctive relief in the form attached to this recommendation.

## G.    Attorneys' Fees and Costs

HTS seeks $27,694.55 in attorneys' fees and costs pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), and Ariz. Rev. Stat. § 44-404. (Doc. 17, attachment 1 at 19-20.) The AUTSA authorizes the court to award "reasonable attorney fees to the prevailing party for . . . willful and malicious misappropriation."  Ariz. Rev. Stat. § 44-404(3).  The Lanham Act authorizes the court to award the prevailing party attorney's fees in "exceptional" cases. 15 U.S.C. § 1117(a).  The Ninth Circuit has held that "exceptional" refers to cases in which the defendant's infringing behavior was malicious, fraudulent, deliberate, or willful.  *See Gracie v. Gracie,* 217 F.3d 1060, 1068 (9th Cir. 2000) (quotation omitted) (affirming award of attorney's fees based on jury's finding that infringement was willful).  Willful infringement occurs when

the defendant knowing and intentionally infringes on a trademark. *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216-17 (9th Cir. 2003). Willfulness can also be inferred from a defendant's failure to defend. *Philip Morris*, 219 F.R.D. at 500.

Here, Boley did not defend this action, and the allegations in the Complaint, admitted on Boley's default, reflect that his misconduct was willful and malicious. Accordingly, HTS is entitled to an award of attorneys' fees. In support of its request for attorneys' fees, HTS has submitted the Declaration of Jeffrey Johnson stating that HTS incurred $27,694.55 in attorneys' fees and costs. (Johnson Decl.) In its proposed default judgment, HTS clarifies that its seeks $27,157.95 in attorney's fees and $536.60 in costs. (Doc. 17, attachment 6.)

### 1. Attorneys' Fees

The starting point for determining reasonable fees is calculating the lodestar, which is obtained by multiplying the number of hours reasonably expended on litigation by a reasonable hourly rate. *Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1262 (9th Cir. 1987) (citing *Hensley v. Echkerhart*, 461 U.S. 424 (1983)). In determining a reasonable number of hours, the court reviews the records to determine whether the hours claimed by the applicant are adequately documented and whether any of the hours claimed were unnecessary, duplicative, or excessive. *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). To determine a reasonably hourly rate for each attorney, the court looks to the prevailing rate in the community for similar work performed by attorneys of comparable skill, experience, and reputation. *Id.* at 1210-11. The party seeking fees bears the burden of establishing entitlement to fees and submitting supporting evidence. *Hensley*, 461 U.S. at 433, 437. The Court may reduce an award based on inadequate documentation of hours or rates requested. *Id.* at 433.

Here, the rates charged by HTS's counsel, Schmeiser, Olsen & Watts, LLP, are reasonable considering each attorney's expertise and level of experience.[17] (Johnson Decl. ¶ 9.)

_____

[17] Attorney Jeffrey Johnson has an hourly rate of $325.00. Johnson is licensed in Michigan and Arizona, is a licensed patent agent and has practiced intellectual property law for over four years. Attorney Sean Enos has an hourly rate of $325.00. Enos is licensed in Arizona

Additionally, the Johnson Declaration includes sufficient detail, including time sheets, for the Court to determine that the amount of time spent on this case was reasonable. (Johnson Decl., Ex. A.); *See Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975) (when awarding attorney's fees, the court should consider the time and labor required, the novelty and difficulty of the legal issues, the skill required to properly research the issues, the preclusion of other employment due to acceptance of the case, the attorney's customary fee, whether the fee is fixed or contingent, time limitations imposed by the client or the circumstances, the amount involved and the results obtained, the reputation and skill of the attorneys, the undesirability of the case, the nature and length of the professional relationship with the client, and awards in similar cases). Accordingly, the Court recommends an award attorney's fees in the amount of $27,157.95.

### 2.    Non-Taxable and Taxable Costs

HTS also seeks costs pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a). (Doc. 17, attachment 1 at 19.) The Lanham Act provides for an award of costs "[w]hen a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover . . . the costs of the action." 15 U.S.C. § 1117(a) (emphasis added).

Although HTS's proposed default judgment includes $536.60 in costs, (Doc. 17, attachment 6 ¶ 4), its briefing and the Johnson Declaration only request a lump sum of attorneys' fees and costs in the amount of $27,694.55 and do not break out the $536.60 in costs. (Doc. 17,

---

and admitted to practice before the U.S. Patent and Trademark Office. He has practiced intellectual property law for seven years. Attorney Albert Schmeiser has an hourly rate of $450.00. Schmeiser has been admitted to practice in New York, before the United States Supreme Court, and in the U.S. Patent and Trademark Office. He has practiced intellectual property law for over thirty years. (Johnson Decl. ¶ 9.)

attachments 1 and 2.)  However, the Court reviewed the billing statements attached to the Johnson Declaration and found the following entries that total $536.60 and thus, may comprise HTS's requested costs: (1) $350.00 court filing fee (Johnson Decl., Ex. A at 5); (2) $40.00 "skip trace" fee to locate Defendant Boley for service of process (*Id*. at 7); and (5) a courier service fee of $146.60.[18]  (*Id.* at 12.)

Because HTS may properly recover $350.00 for court filing fee as a taxable cost pursuant to 28 U.S.C. § 1923 and LRCiv 54.1(e)(8), the Court recommends that HTS be awarded that fee, and need not consider whether it is recoverable under the Lanham Act.  The $146.60 courier service fee is not recoverable under 28 U.S.C. § 1920 or LRCiv 54.1.  However, this cost is reasonable and is the type of cost contemplated by § 1117(a).  Therefore, the Court recommends an award of $146.60 in courier service fees.  *See World Triathlon Corp. v. Dunbar*, 539 F. Supp. 2d 1270, 1290 (D. Hawaii 2008) (awarding delivery fees under § 1117(a)).

Finally, the skip trace fee is not recoverable under 28 U.S.C. § 1920 or LRCiv 54.1.  However, because HTS attempted to mail a waiver of service request to Boley, it can recover the skip trace fee incurred in investigating Boley's address for service of process.  *See* Fed. R. Civ. P. 4(d)(2)(A) (if defendant fails, without good cause, to return a waiver of service of process, "the court must impose on the defendant . . . the expenses later incurred in making service"); *Sandoval v. Little Concessions*, *LLC*, 2011 WL 780874, *1 (N.D. Ill. Feb. 28, 2011) (awarding plaintiff its skip trace fees incurred in investigating defendant's address for service of process).  Because the skip trace fee is recoverable under Rule 4(d)(2)(A), the Court need not consider whether is its also recoverable under the Lanham Act.  Accordingly, the Court recommends that HTS be awarded $536.60 in costs.

---

[18]  The billing statements also include the following expenses: (1) $21.00 and $3.50 in "print charge[s]" for a total of $24.50 (*Id*. at 10, 12); and, (2) postage charges of $.45, $12.40, $12.75 and $5.75 for a total of $31.35 (Doc. 17, attachment 2, Ex. A at 7, 10, 12 and 16).  The "print charges" are not explained, see LRCiv 54.1(e)(5) and (6), and thus are not taxable.  Postage is not included in 28 U.S.C. § 1920 and is not recoverable.

**IT IS RECOMMENDED** that Plaintiff's Motion for Default Judgment (Doc. 17) be **GRANTED** as set forth below.

**IT IS FURTHER RECOMMENDED** that Plaintiff be awarded the following damages:

1. $26,772.00 for a lost business opportunity based on Boley's breach of his duty of loyalty and misappropriation of trade secrets in violation of Ariz. Rev. Stat. § 44-401;

2. $9,994.35 for the value of HTS products that Boley gave away without authorization;

3. $88,937.42 for compensation paid to Boley during a period of disloyalty;

4. $225.00 in miscellaneous damages based on Boley's breach of his duty of loyalty; and

5. $53,545.80 in exemplary damages pursuant to Ariz. Rev. Stat. § 44-403(B).

**IT IS FURTHER RECOMMENDED** that Plaintiff be granted an award of attorneys' fees in the amount of $27,157.95 and non-taxable and taxable costs in the amount of $536.60.

**IT IS FURTHER RECOMMENDED** that Plaintiff be awarded post-judgment interest under 28 U.S.C. § 1961.

**IT IS FURTHER RECOMMENDED** that the Court enter an Order providing permanent injunctive relief in the form attached to this recommendation.

**IT IS FURTHER RECOMMENDED** that Plaintiff's claims against Defendant NuVision be dismissed without prejudice for failure to serve pursuant to Fed. R. Civ. P. 4(m).

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of the District Court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6 and 72. Thereafter, the parties have fourteen days within which to file a response to the objections. Failure to file timely objections to the Magistrate Judge's Report and Recommendation may result in the District Court's acceptance of the Report and Recommendation without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure to file timely objections to any factual determinations of the Magistrate Judge may be considered a

waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See* Fed. R. Civ. P. 72.

DATED this 20th day of May, 2013.

Bridget S. Bade
United States Magistrate Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT

1
2
3
4
5
6            IN THE UNITED STATES DISTRICT COURT
7              FOR THE DISTRICT OF ARIZONA
8
9   HTS, Inc., an Arizona Corporation      )   No. CV-12-835-PHX-BSB
                                           )
10            Plaintiff,                    )   **[RECOMMENDED] ORDER**
                                           )
11  vs.                                     )
                                           )
12  David Boley, an individual, and        )
    NuVision, Systems, an entity of        )
13  unknown origin,                        )
                                           )
14                                          )
              Defendants.                   )
15  _____)

The Court has considered the request for injunctive relief in Plaintiff HTS, Inc.'s (HTS) motion for default judgment (Doc. 17), and finds that HTS has established good cause for an order permanently enjoining Defendant David Boley (Boley) from using, possessing, disclosing, or infringing upon HTS's trademarks and trade secrets.

Accordingly,

**IT IS ORDERED that**:

1.      Boley, his agents, representatives, employees, assigns, and suppliers, and all persons acting in concert or privity with Boley, are permanently enjoined from using any HTS trademarks, specifically HTS's "eye-design" logo (the Mark), as shown in the exhibits to the Complaint, (Doc. 8, Exs. A and B), including formatives thereof, or any other name, mark, designation or depiction in a manner that is likely to cause confusion regarding whether Boley is affiliated or associated with, or sponsored by HTS, or that is likely to dilute the distinctiveness of HTS's trademark or any other marks owned by HTS.  Specifically, Boley is

permanently enjoined from using the NuVision "eye-design" logo (the infringing Mark) on the form shown in the exhibits to the Complaint (Doc. 8, Exs. C and D).

2.      Boley, his agents, representatives, employees, assigns, and suppliers, and all persons acting in concert or privity with Boley, are permanently enjoined from assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraph 1.

3.      Boley is permanently enjoined from possessing, and shall immediately destroy or surrender to HTS, all stationery, forms, printed matter, advertising, and paper goods containing HTS's Mark, formatives thereof, and the infringing Mark.

4.      Boley is permanently enjoined from using, in connection with any business or the promotion thereof, any reproduction, counterfeit, copy, or colorable imitation of HTS's Mark, formatives thereof or trade dress; and Boley shall not utilize any designation of origin or description or representation that falsely suggests or represents any association or connection with HTS.

5.      Boley, his agents, representatives, employees, assigns, and suppliers, and all persons acting in concert or privity with Boley, are permanently enjoined from possessing, utilizing, or disclosing any of HTS's confidential information (including Trade Secrets), specifically including HTS's client identification information, client contact information, and financial information.

6.      Boley, his agents, representatives, employees, assigns, and suppliers, and all persons acting in concert or privity with Boley, are permanently enjoined from breaching fiduciary duties owed to HTS, including by retaining, using, or disclosing any of HTS's confidential information (including Trade Secrets), specifically including HTS's client identification information, client contact information, and financial information.

7.      Boley, his agents, representatives, employees, assigns, and suppliers, and all persons acting in concert or privity with Boley shall immediately destroy or surrender to HTS, any and all HTS confidential and/or Trade Secret information in the possession of Boley, his

agents, representatives, employees, assigns, and suppliers, and all persons acting in concert or privity with Boley.